[Cite as *State v. Jamie*, 2015-Ohio-3583.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 102103**

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## MAJOR JAMIE

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-581872-A

**BEFORE:** Keough, P.J., McCormack, J., and Stewart, J.

**RELEASED AND JOURNALIZED:** September 3, 2015

**ATTORNEY FOR APPELLANT**

Robert A. Dixon
4403 St. Clair Avenue
Cleveland, Ohio 44103

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
By: Daniel A. Cleary
Assistant Prosecuting Attorney
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

KATHLEEN ANN KEOUGH, P.J.:

{¶1} Defendant-appellant Major Jamie ("Jamie")[1] appeals from the trial court's judgment, rendered after a jury verdict, finding him guilty of murder, kidnapping, and felonious assault, and sentencing him to 15 years to life in prison. Finding no merit to the appeal, we affirm.

## I.  Background

{¶2} The Cuyahoga County Grand Jury indicted Jamie in a multicount indictment as follows: Count 1, aggravated murder in violation of R.C. 2903.01(A); Count 2, aggravated murder in violation of R.C. 2903.01(B); Count 3, kidnapping in violation of R.C. 2905.01(A)(3); Count 4, murder in violation of R.C. 2903.02(B); and Count 5, felonious assault in violation of R.C. 2903.11(A)(1).

{¶3} The evidence at trial demonstrated that on September 15, 2012, a maintenance worker at the Boulevard Terrace Apartments located near Madison Avenue and West Boulevard in Cleveland, Ohio, discovered the lifeless body of Robert Cherry slumped in the front seat of his car in the apartment complex parking lot. Cleveland police officers responded to the scene. One of the officers noticed that the body had small nick marks on the neck, although the body did not show other outward signs of

_____

[1]Although the correct spelling of appellant's last name is Jaime, we use the spelling set forth in the indictment and lower court filings.

violence.  Personnel from the coroner's office removed the body and conducted an autopsy.

{¶4} Dr. Krista Timm, forensic pathologist for the Cuyahoga County medical examiner's office, performed the autopsy.  She testified that she noted abrasions on Cherry's neck and small hemorrhages in the soft tissue around the eyes caused by compression of blood vessels in the neck.  Dr. Timm reported that her internal examination of the body revealed injuries to the neck, including fractures of the hyoid bone and hemorrhages around the fractures.  She opined that the cause of death was homicide, and the manner was asphyxia by cervical compression.  Dr. Timm testified that Cherry's injuries could have been due to strangulation by hand; she testified further that Cherry could have caused the nicks to his neck as he was trying to defend himself.

{¶5} Kenneth Bradford testified that he and Cherry had been romantically involved in the late 1980s, but remained best friends after their romantic relationship ended.  Bradford testified that at the time of his death, Cherry's "main boyfriend" was Jamie, although he was also dating Donald "Tank" Simon, and a man named Heidi. Bradford said that Cherry had told him that Simon was upset because Cherry was ending their relationship to be with Jamie.  Bradford said that Cherry was in love with Jamie and initially excited when Jamie returned to Cleveland in August 2012, but their relationship quickly became "rocky" because Jamie also had a girlfriend.

{¶6} Jamie and his girlfriend, Lisha Robinson, lived on West 99th Street in Cleveland, only a few blocks away from Cherry's apartment.  Bradford testified that

Cherry told him that he planned to tell Robinson about his relationship with Jamie. Robinson testified that she knew nothing about Cherry when she lived with Jamie, and only learned of his sexual preference in June 2014, when she watched "The First 48," a television program about the police investigation of Cherry's murder.

{¶7} On the evening of September 14, 2012, Bradford, his friend Ulysses Tyler, and Cherry went to the home of Gloria and Jeffrey Monday to socialize and drink. According to Gloria, Cherry spoke with Jamie by telephone once during the evening. Bradford said that he, Tyler, and Cherry left the gathering at approximately 12:30 to 1:00 a.m. on September 15, 2012. Bradford testified that Cherry had told him several times that he was going to meet Jamie later to celebrate his birthday.

{¶8} Cleveland police detective Raymond Diaz testified that he began investigating the murder on September 17, 2012. Upon searching Cherry's apartment, the police found a letter from Jamie dated August 8, 2011, signed "your man and husband, Major Jaime," and a handwritten note containing the name and telephone number of Jamie's parole officer on the night stand in the bedroom. The police also found a calendar hanging on the bedroom wall that contained handwritten entries for August 25, 2012 through August 31, 2012, and September 1, 2012 through September 4, 2012. Jamie was shown the calendar when he was interrogated and identified the calendar and the writing on it as Cherry's. The entries on the calendar detail Cherry's feelings about the days in question and show that his relationship with Jamie deteriorated quickly after August 25, 2012. The last entry, dated September 4, 2012, states that Cherry called the

police about Jamie to report "what he's doing and what he did in jail and where he's living lot's of drugs."

{¶9} Diaz testified that after interviewing Bradford, the police began investigating Jamie. Tom Ciula, the forensic video and audio specialist for the Cleveland police department, obtained surveillance videos from 11:45 p.m., September 14, 2012, to 4:00 p.m., September 15, 2012, from six locations near the Boulevard Terrace Apartments, including the CVS store on the east corner across the street from Cherry's apartment, a pawn shop on the southeast corner, and Cleveland Fire Station No. 23, located at 9826 Madison Avenue in Cleveland. Ciula put the videos from the various locations together to create a timeline of events from 12:13 a.m. to 1:38 a.m.

{¶10} The video showed that at approximately 12:14 a.m., a vehicle similar to Cherry's turned from Madison Avenue into the driveway of the Boulevard Terrace Apartments. About four minutes later, the same vehicle came back out of the driveway and turned eastbound on Madison Avenue. At approximately 12:29 a.m., the same vehicle turned south onto West 99th Street. Six minutes later, the same vehicle came up West 100th Street, turned westbound onto Madison Avenue and then turned into the apartment complex driveway and went behind the apartment building. At 1:08 a.m., a male walked from the apartment complex parking lot across West Boulevard, and then headed east on Madison Avenue. The male subsequently crossed to the south side of Madison Avenue, walked through a park located at the end of West 99th Street, and then walked up West 99th Street.

**{¶11}** Diaz testified that he believed the car in the video sequence was Cherry's because the driver in the video was wearing a white hat, which the police later found in his car. Diaz also testified that upon his review of the video, he saw one person in the car when it initially headed east on Madison Avenue toward West 99th Street, but two people in the car when it returned to the apartment complex. Jamie's girlfriend Lisha Robinson testified that the quickest way to her house from Madison Avenue was to cut through the park at the end of the street, and acknowledged that the figure in the video was walking in the direction of her house. She also testified that the figure in the video had dreadlocks, and that Jamie had dreadlocks at the time of the murder. Diaz testified that when the police interviewed Jamie on September 20, 2012, they observed scratch marks on his right hand and left wrist.

**{¶12}** Diaz testified that Cherry's cell phone records indicated that all outgoing activity from Cherry's phone stopped on September 15, 2012, at 12:43 a.m. The text messages also demonstrated that Cherry and Jamie's relationship quickly deteriorated after Jamie returned to Cleveland. For example, on August 29, 2012, Cherry texted Jamie, "Same old shit Major. U played wit my feelings again and used me for ur come up. Its cool. See u in a minute wit all ur shit. I want my keys and phone. Be wit her." When Jamie responded that he would be home soon, Cherry texted, "No, I mean wat I said dude. U still da asshole from before. I don't want to argue or fight. Just do u leave me alone. I want my shit. Nothing else. Please." On August 31, 2012, Cherry texted Jamie that "U lie about everything. U see how u do me. After three years why do

I have to be dogged by u for people who was not there for u. I am not doing good man." Jamie responded, "U trippin about nothing. I will be home!" Within five minutes, Cherry texted Jamie, "No, I am not tripping. U will see tonight how I can trip u when u get here. I will call da police. I ask u not to fuck wit me, didn't I." The following day, September 1, 2012, Jamie texted Cherry that he would see him when he got off work. Cherry responded, "I am prepared to die this morning on everything I love. U coming out or I am coming in. I am telling it all in front of them all." The texts reflect that on September 2, 2012, Cherry put Jamie's belongings on Jamie's girlfriend's porch and then told him, "U have wat u want. Be happy. Give my keys and phone. If no phone goes off at 3 today. I talked to police already. Told them all. U are not suppose to be here. No way." When Jamie responded, "Whatever! Kick Rocks Hoe!", Cherry texted him, "Da police told me to call ur PO and tell him what I told them cause I am afraid for my life. They will pick you up now. Whos da hoe." Diaz pointed out in his testimony that this text corresponded with Cherry's September 2, 2012 notation on his calendar of "Night. Called me. Told me to kick rocks. Why. My turn. Police."

{¶13} Tony Luketic, Jamie's parole officer, testified that he began supervising Jamie in August 2012 when he returned to Cleveland. He said that on September 6 or 7, 2012, he received a voicemail from Cherry in which Cherry advised him of something that would have been a violation of Jamie's parole. Luketic returned Cherry's call but was unable to reach him. Luketic said that he recognized the voice as Cherry's because

he had spoken with Cherry in mid-August 2012 to advise him why Jamie's placement with Cherry had been denied.

{¶14} Carey Baucher, a DNA analyst in the Cuyahoga County's medical examiner's office, testified regarding various DNA samples obtained from Cherry's car. The DNA swab from under the fingernails of Cherry's left hand was a mixture of Cherry and Jamie's DNA. Jamie's DNA was also found in a swab from the rear of the driver's seat headrest. Baucher also identified a DNA sample retrieved from the right rear door interior handle as belonging to Simon. She testified that during her investigation in 2013, she had submitted the sample to the Ohio DNA database (CODIS) and received a match to Simon. She emailed the Cleveland police department several times in May and June 2013 requesting either a DNA standard from Simon or an acknowledgment that he was not a suspect, but received no response to her request.

{¶15} Simon testified that he met Cherry in 2011 and was not surprised that his DNA was found in Cherry's car because he had been in the car "a lot." He said that he and Cherry were not in love with each other, although they would sometimes drink too much and then sleep together. At the time of the murder, he lived with his girlfriend, who knew nothing about Cherry. He denied killing Cherry and testified that he last saw him two weeks before he was murdered.

{¶16} On cross-examination, Simon admitted that he was never interviewed in 2012 about Cherry's murder. He also admitted that on September 8, 2012, about a week before his death, Cherry called him 38 times from 9:41 p.m. Friday evening to 5:00 a.m.

Saturday morning. Simon testified that most of these calls were probably voicemails, however, and that he only called Cherry back twice during that period. Simon testified further that he knew Cherry was in love with Jamie and insisted he was not upset when he learned that Jamie was returning to Cleveland in August 2012. He denied that Cherry ever threatened to divulge their sexual relationship to his girlfriend or to his mother, Gloria Monday, or stepfather, Jeffrey Monday.

{¶17} The defense rested without presenting any witnesses. After the trial court granted Jamie's Crim.R. 29 motion in part and dismissed Count 2 (aggravated murder), the jury found him not guilty of aggravated murder (Count 1) but guilty of kidnapping, murder, and felonious assault (Counts 3, 4, and 5). The trial court sentenced him to 15 years to life in prison, and this appeal followed.

## II. Analysis

### A. Due Process of Law and A Fair Trial

{¶18} In the middle of trial, the prosecutor revealed to the defense that it had just learned from Baucher that a DNA sample found in the backseat of the car where Cherry was found had been identified as belonging to Simon, one of Cherry's boyfriends. In a lengthy discussion with the court following this disclosure, the defense acknowledged that the discovery of Simon's DNA in Cherry's car bolstered its defense, but argued that the defense would have investigated Simon more fully if they had known that his DNA had been found in the car. In response, the trial court asked defense counsel, "So what's your remedy? Do you want it excluded or a mistrial and you want to start over?"

Counsel did not ask for a mistrial and stated that the defense did not want evidence of Simon's DNA excluded, but requested latitude in questioning witnesses about Simon.

{¶19} In his first assignment of error, Jamie contends that he was denied due process of law and a fair trial because the state withheld exculpatory evidence, specifically the fact that Simon's DNA had been found in the back seat of the car. He contends there is no question that the state withheld the evidence, and that the evidence of Simon's DNA in Cherry's car was material because it gave the defense a solid basis to argue an alternate suspect. Accordingly, he argues that the prosecution's failure to disclose the evidence regarding Simon's DNA was a "clear violation" of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

{¶20} In *Brady*, the United States Supreme Court held that the prosecution's suppression of evidence favorable to the accused upon request violates due process where the evidence is material to guilt or punishment, irrespective of the government's intentions. *Id.* at 87. Subsequently, in *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the United States Supreme Court stated that the *Brady* rule applies only in situations involving the discovery *after trial* of information that was known to the prosecution but unknown to the defense. Accordingly, the Ohio Supreme Court has found there is no *Brady* violation where the alleged exculpatory records were presented during trial. *State v. Wickline*, 50 Ohio St.3d 114, 552 N.E.2d 913 (1990). Because the prosecutor presented the evidence of Simon's DNA to the defense during trial, there was no *Brady* due process violation.

{¶21} Moreover, we find no violation of Jamie's right to a fair trial. Crim.R. 16 regulates discovery in criminal trials. Under Crim.R. 16(E)(3), the trial court is vested with discretion in determining the sanction to be imposed for a party's nondisclosure of discoverable material. Specifically, the rule provides that where it is brought to the court's attention that a party has failed to properly disclose evidence, the court may order the party to permit the discovery or inspection, grant a continuance, prohibit the party from introducing in evidence the material not disclosed, or make any other order it deems just under the circumstances. Thus, our review is limited to whether the trial court's action in this case constituted an abuse of discretion. *State v. Parson*, 6 Ohio St.3d 442, 445, 453 N.E.2d 689 (1983). We find that it did not.

{¶22} First, as defense counsel admitted at trial, the state's failure to disclose was not a willful violation of Crim.R. 16. Second, other than his vague assertion that the defense would have investigated Simon more thoroughly prior to trial, Jamie has not demonstrated how knowledge that Simon's DNA was found in Cherry's car would have benefitted him in the preparation of his defense. Notably, when the prosecutor told the defense about Simon's DNA, counsel did not request a continuance for further investigation. Third, Jamie has failed to demonstrate that he was prejudiced by the state's failure to disclose that Simon's DNA was found in Cherry's car. In fact, it is apparent the defense was well aware of Simon prior to trial. He was listed on the state's witness list, and his telephone number appeared on the phone records that were provided to defense counsel prior to trial and used by defense counsel to extensively cross-examine

witnesses, including questioning Simon about Cherry's 38 calls to him. Jamie's defense from the outset was that the botched investigation by the police resulted in his improper arrest and indictment because any of Cherry's other boyfriends was the murderer. The discovery of Simon's DNA in the car did nothing but enhance his theory. Accordingly, Jamie's first assignment of error is overruled.

B.     Ineffective Assistance of Counsel

{¶23} In his second and sixth assignments of error, Jamie contends that he was denied his right to effective assistance of counsel. We consider these assignments of error together because they are related.

{¶24} To establish ineffective assistance of counsel, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonable performance and that he was prejudiced by that deficient performance, such that, but for counsel's error, the result of the proceedings would have been different. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 205, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In short, counsel's errors must be so serious as to render the result of the trial unreliable. In evaluating a claim of ineffective assistance of counsel, a court must be mindful that there are countless ways for an attorney to provide effective assistance in a given case, and it must give great deference to counsel's performance. *Id.* at 689.

{¶25} In his second assignment of error, Jamie contends that the state's failure to disclose Simon's DNA prior to trial rendered defense counsel ineffective because counsel

was unable to adequately investigate and prepare for trial. He argues further that the court "induced counsel's ineffectiveness by giving counsel the untenable choice of either exclusion of the DNA evidence or a retrial." In his sixth assignment of error, Jamie asserts that he was denied effective assistance of counsel because counsel did not request a mistrial in response to the state's alleged *Brady* violation regarding Simon's DNA. These arguments are without merit.

{¶26} First, as discussed above, it is apparent from the record that defense counsel was well aware of Simon before trial and prepared to present him as a suspect. Second, the trial court did not induce any ineffective assistance of counsel. Indeed, in response to the state's disclosure that Simon's DNA had been found in Cherry's car, the court asked counsel "what's your remedy?" It is not apparent that the only possible alternatives were excluding the DNA or mistrial; counsel could have requested a short continuance to allow for further investigation of Simon. Defense counsel acknowledged, however, that Simon's DNA in Cherry's car undoubtedly helped its case because, consistent with counsel's theory, it put someone other than Jamie in the backseat of the car. Recognizing this, counsel opted for continuing with the trial.

{¶27} Counsel's strategy from the outset of trial, even without the discovery of Simon's DNA, was to attack the police investigation that led to Jamie's arrest. In opening statement, counsel argued that the police had decided early on that Jamie was the murderer, and then neglected to investigate other viable suspects, such as Simon, and another male with whom Cherry had a continuing relationship and who had been known

to be violent with Cherry in the past. Thus, the discovery mid-trial that Simon's DNA had been found in Cherry's car as early as 2013, and that Simon had never been investigated by the police, only enhanced Jamie's theory of the case. Defense counsel made a strategic decision not to exclude Simon's DNA and to continue with the trial. Trial tactics and strategies do not constitute a denial of effective assistance of counsel. *State v. Gooden*, 8th Dist. Cuyahoga No. 88174, 2007-Ohio-2371, ¶ 38, citing *State v. Clayton*, 62 Ohio St.2d 45, 402 N.E.2d 1189 (1980).

**{¶28}** Finding no ineffective assistance of counsel, Jamie's second and sixth assignments of error are overruled.

C.      Other Acts Evidence

**{¶29}** In his third assignment of error, Jamie contends that he was denied due process of law and a fair trial because the court improperly admitted other acts evidence under Evid.R. 404(B). Specifically, he objects to Tony Luketic's testimony that he began supervising Jamie in August 2012 when he returned to Cleveland. Jamie contends that although no mention was made during trial that he had been in prison, Luketic's testimony indicated to the jury that he was on parole for a prior conviction, thereby allowing the jury to use this evidence to conclude that he was of bad character.

**{¶30}** "'Evidence that an accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime or that he acted in conformity with bad character.'" *State v. Ceron*, 8th Dist. Cuyahoga No. 99388, 2013-Ohio-5241, ¶ 67, quoting *State v.*

*Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 15. There are exceptions, however, to this rule.

**{¶31}** Under Evid.R. 404(B, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Hence, the rule affords the trial court broad discretion regarding the admission of other acts evidence. *Williams* at ¶ 17.

**{¶32}** In determining whether other-acts evidence is to be admitted, trial courts should conduct a three-step analysis. The first step is to determine if the other-acts evidence "is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence" under Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith, or whether the other-acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). Finally, the court should consider whether the probative value of the other-acts evidence is substantially outweighed by the danger of unfair prejudice. *Williams* at ¶ 20, citing Evid.R. 403.

**{¶33}** With respect to the first and second steps of the *Williams* analysis, we find that the challenged testimony was relevant and offered for a legitimate purpose, i.e., to show Jamie's motive for killing Cherry. Luketic testified that Jamie was put on his

caseload when Jamie returned to Cleveland in August 2012. He testified further that in early September 2012, Cherry, whose voice he recognized, left him a voicemail containing information that could have led to sanctions against Jamie. Cherry was killed, however, before Luketic was able to speak to him about the voicemail. Jamie was aware that Cherry had called Luketic because Cherry had advised Jamie via text that he had called his parole officer. Thus, Luketic's testimony, if believed by the jury, provided a possible motive for Jamie to kill Cherry: he was upset that Cherry had called his parole officer.

{¶34} Regarding the third step of the *Williams* analysis, we find that the danger of unfair prejudice did not substantially outweigh the probative value of the challenged testimony. Unfairly prejudicial evidence is that which might result in an improper basis for a jury decision. *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 2001-Ohio-248, 743 N.E.2d 890. Generally, "'unfairly prejudicial evidence appeals to the jury's emotions rather than intellect.' Weissenberger, Ohio Evidence (2000) 85-87, Section 403.3." *Id.* The challenged evidence does not meet this standard. Luketic's testimony proved Jamie's possible motive for killing Cherry.

{¶35} Furthermore, even if the other-acts evidence were improperly admitted, we would find its admission to be harmless because the outcome of the trial would have been the same even if the challenged testimony had not been admitted. The state presented substantial evidence of Jamie's guilt, even without Luketic's testimony. Bradford testified that Cherry had told him that he planned to tell Jamie's girlfriend about his

relationship with Jamie, and Cherry told Jamie that he was going to tell people about them, providing another possible motive for Jamie to kill Cherry. In addition, the state presented evidence that Jamie's DNA was found in Cherry's car on the rear of the driver's head rest, supporting the state's theory that Jamie strangled Cherry from behind as he sat in the driver's seat. Jamie's DNA was also found under Cherry's fingernails, and Jamie had scratch marks on his right hand and left wrist, indicating that Cherry struggled with Jamie as he strangled him. And finally, the state presented video evidence that Cherry picked Jamie up at his home on West 99th Street and drove back to the parking lot of his apartment complex, where Jamie strangled him before walking home.

**{¶36}** Because the other-acts testimony was admissible under Evid.R. 404(B), the third assignment of error is overruled.

D.    Manifest Weight of the Evidence

**{¶37}** "A manifest weight challenge * * * questions whether the prosecution met its burden of persuasion." *State v. Ponce*, 8th Dist. Cuyahoga No. 91329, 2010-Ohio-1741, ¶ 17, quoting *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982). The manifest weight standard of review requires us to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Otten*, 33 Ohio App.3d 339, 515 N.E.2d 1009 (9th Dist. 1986), paragraph one of the syllabus.

**{¶38}** In his fourth assignment of error, Jamie contends that his convictions are against the manifest weight of the evidence because the evidence against him was based entirely on equivocal circumstantial evidence that fell short of proof beyond a reasonable doubt. Jamie's argument is without merit.

**{¶39}** First, circumstantial evidence alone is sufficient to support a conviction; physical evidence is not required. *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988), paragraph two of the syllabus; *State v. Lopez*, 8th Dist. Cuyahoga No. 94312, 2011-Ohio-182, ¶ 62, citing *State v. Jenks*, 61 Ohio St.3d 529, 574 N.E.2d 492 (1991), paragraph one of the syllabus. In this case, however, in addition to the significant circumstantial evidence linking Jamie to the murder, there was physical evidence that corroborated the circumstantial evidence. DNA analyst Baucher testified that "on-body" evidence is the most probative evidence in strangulation cases, so fingernail scrapings are often tested in such cases. Here, Jamie's DNA was recovered from under Cherry's fingernails and from the rear of the driver's seat headrest. Additionally, small scratch marks were found on his hand and wrist several days after Cherry was strangled.

**{¶40}** Although Jamie contends that the police should have investigated other possible suspects, the state's evidence established that Jamie had a motive to kill Cherry. In addition, the video evidence, which Jamie fails to acknowledge or attempt to refute, demonstrated that Cherry picked Jamie up at his home on West 99th Street at approximately 12:30 a.m., September 15, 2012, and drove him back to the parking lot of his apartment complex. A half-hour later, a male with dreadlocks, which Jamie had at

the time of the murder, is seen walking down Madison Avenue and returning to West 99th Street, where Jamie lived. The video coincided with Cherry's telephone records, which demonstrated that Cherry's last telephone call was made at 12:43 a.m. on September 15.

**{¶41}** Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial is reserved for only those "exceptional cases in which the evidence weighs heavily against the conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. This is not that exceptional case. Our review of the record demonstrates that the jury did not lose its way or create a manifest miscarriage of justice in convicting Jamie of kidnapping, murder, and felonious assault. The fourth assignment of error is therefore overruled.

E.     The Police Investigation

**{¶42}** In his fifth assignment of error, Jamie contends that the negligent police investigation in this case deprived him of due process of law and equal protection.

**{¶43}** Upon cross-examination, Detective Diaz admitted that the police should have investigated Simon, although he testified that nothing from the police interviews or evidence from the coroner's office pointed to Simon as a suspect. He also admitted that the police never interviewed Gerald Felder, the last person to call Cherry, and with whom Cherry had a sexual relationship —  because they could not find him. He testified further that although the police looked for another man with whom Cherry previously had a relationship and who was known to have tried to choke Cherry in 2002, they could not

find him and never spoke with him. Jamie contends that this "negligent investigation compromised the entire process and deprived him of any real ability to have a fair trial." We disagree.

**{¶44}** Although Diaz admitted that the police should have interviewed Simon, the evidence demonstrated, contrary to Jamie's assertions, that the police tried to talk to Felder and the other male but could not find them. They did not pursue them because all of the evidence pointed to Jamie as the murderer. We do not find this to be negligence, or somehow a denial of due process or equal protection. The police investigation produced significant evidence of Jamie's involvement in the murder, and his assertion of police incompetence does not change the evidence against him. That evidence was presented to the jury, who found him guilty. As discussed above, his convictions were supported by the weight of the evidence. Accordingly, the fifth assignment of error is overruled.

**{¶45}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

KATHLEEN ANN KEOUGH, PRESIDING JUDGE

TIM McCORMACK, J., and
MELODY J. STEWART, J., CONCUR