[Cite as *State v. Collins*, 2019-Ohio-1239.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 107020**

---

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**JOSEPH M. COLLINS, JR.**

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-17-616760-A

---

**BEFORE:**  Blackmon, P.J., Laster Mays, J., and Jones, J.

**RELEASED AND JOURNALIZED:**  April 4, 2019

**ATTORNEY FOR APPELLANT**

Jennifer N. McTernan
Jennifer N. McTernan, L.L.C.
11510 Buckeye Road
Cleveland, Ohio 44104


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

By: Jillian J. Snyder
Assistant County Prosecutor
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

PATRICIA ANN BLACKMON, P.J.:

**{¶1}** Joseph M. Collins, Jr. ("Collins") appeals his convictions for attempted murder and other associated offenses and assigns the following errors for our review:

> I. Defendant-appellant was denied a fair trial when he suffered actual and substantial pre[j]udice due to multiple refere[n]ces by testifying witnesses to his prior criminal history.

> II. Defendant-appellant was denied ef[f]ective assi[s]tance of counsel in violation of Amendments V, VI and XIV of the United States Constitution, and Article 1, Sections 10 and 16 of the Ohio Constitution.

> III. The jury and court found against the manifest weight of the evidence that the defendant-appellant committed the acts alleged in counts 1, 2, 3, and 4 of the indictment.

**{¶2}** Having reviewed the record and pertinent law, we affirm the decision of the trial court. The apposite facts follow.

**{¶3}** On the night of December 26, 2016, Andre Danner was shot three times outside of an apartment complex on Cedar Avenue in Cleveland, where his girlfriend, Lida Glover, lived. Prior to the shooting, Danner, Lida, Lida's brother Samuel Glover, Lida and Samuel's sister Samantha Robinson, and Samantha's boyfriend Collins had been arguing inside Lida's apartment. During this argument, Collins, who was wearing a grey jogging outfit, lifted his shirt and showed Danner that he had a gun in his waistband.

**{¶4}** The argument eventually dissipated, and the group left the apartment. When Danner was outside, he saw the police approaching and he began to run away from the complex. As he was running, Danner saw two men standing in an alley with shirts over their faces and guns in their hands. Danner began to run the other way, and one of the men fired his gun. Danner was hit in the shoulder and in the back. Danner fell to the ground, face down. Danner turned his head and saw the shooter standing over him. The man shot Danner again in the neck. Danner survived and later identified Collins as the man who shot him, because the shooter was wearing the same grey jogging outfit that Danner saw Collins wearing earlier that evening.

**{¶5}** On May 10, 2017, Collins was charged with attempted murder, two counts of felonious assault, and having a weapon while under disability, along with one- and three-year firearms specifications, a notice of prior convictions specification, and a repeat violent offender specification. On March 9, 2018, a jury found Collins guilty of the attempted murder, two assaults, and all firearm specifications. On the same day, the court found Collins guilty of the remaining count and specifications. On March 12, 2018, the court sentenced Collins to 11 years in prison for the attempted murder, three years in prison for the firearm specifications, and six

years in prison for the repeat violent offender specification, all to run consecutively. The court also sentenced Collins to three years in prison for having a weapon while under disability, to run concurrent to his aggregate sentence of 20 years in prison.

### Prior Criminal History

{¶6} Evid.R. 404(B) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." This court has held that "an error in the admission of 'other act[s]' testimony is harmless when there is no reasonable possibility that the testimony contributed to the accused's conviction." *State v. Nettles*, 8th Dist. Cuyahoga No. 85637, 2005-Ohio-4990, ¶ 15.

{¶7} In the case at hand, Collins argues that three witnesses improperly testified about his criminal history. First, Danner testified that Collins "just got out of jail. * * * It's been like, he had been out like nine months." Defense counsel objected to this testimony, and the court sustained the objection. Additionally, the court instructed Danner that he "cannot talk about [Collins's] prior criminal history, and you can't say things like when he got out of prison, when he got out of jail. You need to keep that — you need to answer questions so that you're not mentioning those things, okay?" This admonition was given outside of the presence of the jury.

{¶8} Second, Cleveland Police Detective Bruce Garner ("Det. Garner") testified as follows: "I actually did computer checks, record checks. OHLEG, which is part of the State Bureau of Motor Vehicles ('BMV') where we're actually able to * * * bring up a person's BMV

information, photos, driving records, so I was able to get a picture of Joseph Collins." Defense counsel's objections were overruled by the trial court.

{¶9} Third, Tiffany Knight, who testified for the defense, stated on cross-examination that Collins told her "I go see my parole officer." The court sustained defense counsel's objection and told Knight the following outside of the presence of the jury: "you are not allowed to speak about a Defendant's prior criminal history * * * so I do not want you to mention parole or anything like that anymore or him being in jail or anything along those lines right now, okay?"

{¶10} Upon review, we find that Det. Garner's testimony did not violate Evid.R. 404(B). Evidence that the police found Collins's picture using a "computer check" of the BMV's website is not evidence of other crimes, wrongs, or acts. Anyone who has an Ohio driver's license or identification card will necessarily have a photograph on file with the BMV, and this does not imply any type of wrongdoing. *See State v. Hall*, 2d Dist. Montgomery No. 19671, 2004-Ohio-663, ¶ 30 (a BMV printout to obtain addresses the defendant has used "does not portray any form of 'bad act' that Evid.R. 404(B) prohibits").

{¶11} As to Danner and Knight's testimony, we find that it contains brief references to Collins having been in jail and on parole. While this testimony may imply that Collins committed a prior "bad act," the state did not introduce this evidence to show Collins's character and that he acted in conformity therewith. Rather, the testimony was inadvertent and unsolicited, the court sustained defense counsel's objections to this testimony, and the court instructed the witnesses to not testify about Collins's criminal history.

{¶12} In *State v. Southam*, 3d Dist. Henry No. 7-12-04, 2012-Ohio-5943, the court found no violation of Evid.R. 404(B) when a deputy sheriff testified that the defendant "ended up having a couple of warrants when I ran him * * *." *Id.* at ¶ 14. The court immediately

sustained an objection to this testimony and overruled the defendant's motion for a mistrial. *Id.* On appeal, the court found that "Deputy Walker's testimony did not detail any specific prior criminal activity, it was general in nature, and neither a particular crime nor a finding of guilt was mentioned. Deputy Walker's brief and inadvertent statement in this case was not the type of testimony about 'prior bad acts' that is usually prohibited in Evid.R. 404." *Id.* at ¶ 20. *See also Bruton v. United States*, 391 U.S. 123, 135-136, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) ("Not every admission of inadmissible * * * evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. A defendant is entitled to a fair trial, but not a perfect one").

{¶13} A harmless error is "[a]ny error, defect, irregularity, or variance which does not affect substantial rights" of the accused. Crim.R. 52(A). To affect substantial rights, "means that the error must have been prejudicial: It must have affected the outcome of the * * * proceedings." *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). In the case at hand, we find no reasonable possibility that the testimony in question contributed to Collins's convictions; therefore, any error is harmless. Accordingly, Collins's first assigned error is overruled.

**Ineffective Assistance of Counsel**

{¶14} To succeed on a claim of ineffective assistance of counsel, a defendant must establish that his or her attorney's performance was deficient and that the defendant was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). However, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of

the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance." *Id.* at 697. *See also State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 3743 (1989).

{¶15} In the case at hand, Collins argues that his counsel was ineffective by failing to ask for a curative instruction and move for a mistrial after Danner, Det. Garner, and Knight testified about Collins's alleged prior bad acts. Due to the disposition of Collins's first assigned error, we cannot say that his counsel performed deficiently by not pursuing and bringing further attention to the fleeting references to his being in jail and on parole, nor can we say that Collins was prejudiced. Furthermore, this court has recently found no error when a trial court did not offer a curative instruction following isolated testimony concerning the defendant's prior criminal history. "The trial court indicated that it did not wish to draw any further attention to the statement and instructed that the questioning move on to another issue." *State v. Payne*, 8th Dist. Cuyahoga No. 105965, 2018-Ohio-1399, ¶ 20.

{¶16} Collins's second assigned error is overruled.

## Manifest Weight of the Evidence

{¶17} In *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, the Ohio Supreme Court addressed the standard of review for a criminal manifest weight challenge, as follows:

> The criminal manifest-weight-of-the-evidence standard was explained in *State v. Thompkins* (1997), 78 Ohio St.3d 380, 1997- Ohio-52, 678 N.E.2d 541. In *Thompkins*, the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively. *Id.* at 386, 678 N.E.2d 541. The court held that

sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief. *Id.* at 386-387, 678 N.E.2d 541. In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's? We went on to hold that although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. *Id.* at 387, 678 N.E.2d 541. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.* at 387, 678 N.E.2d 541, citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

{¶18} An appellate court may not merely substitute its view for that of the jury, but must find that "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387. Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶19} In the case at hand, Collins argues that all of his convictions — the attempted murder, two felonious assaults, and having a weapon while under disability — are against the manifest weight of the evidence. Collins's argument is based on the "complete lack of physical evidence." Specifically, he argues that "[n]o firearms were recovered or tested. No determination was ever even made as to the kind of gun that shot the victim. * * * No suspects

were found at the scene.   The second assailant was never identified.   No video surveillance was collected from the apartment buildings."

{¶20} Collins further argues that his convictions are based on eyewitness statements, particularly Danner's, and that "Danner's testimony was not reliable or credible * * *."   Collins points to inconsistencies within Danner's testimony and between Danner's and other witnesses' testimony as grounds for his convictions being against the weight of the evidence.   We note that the court stated the following outside of the presence of the jury during Danner's testimony:

> So I want to make this clear for the record, and I think that it needs to be established that this Defendant, along with the witnesses, all have cognitive impairments.   It's clear from listening to both the Defendant speak along with this witness [Danner], who is now on the stand speaking, that this is not a trial of people whose IQs are of an average intelligence level.
>
> This is a mental health court case and this Defendant's IQ ranges in the 60s.   So the court is taking extra care to make sure that the Defendant's rights are, of course, protected, however.
>
> * * *
>
> So with that being said, I am going to give the State some latitude in the Direct Examination of this witness because, of course, it's clear that he has cognitive impairments.
>
> It's clear to the Court that while I don't have his IQ test in front of me, it's perfectly obvious from anyone's observation that he is not only having challenges here today, but that he has a very challenging speech pattern that we are now going to try to understand his cadences and the rhythm of his speech as we establish this testimony.
>
> Certainly I'm going to try to stop some of the hearsay that we have coming in, however, this * * * victim will have some challenges even understanding, I think, what the Court is saying.

{¶21} This court has recently held that a "factfinder may believe and convict a defendant based upon the testimony of a single eyewitness, including the victim."   *State v. Robertson*, 8th Dist. Cuyahoga No.   106279, 2018-Ohio-2934, ¶ 30.   Furthermore, a conviction is not against

the weight of the evidence "solely because the jury heard inconsistent testimony." *State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38. Additionally, this court has held that "circumstantial evidence alone is sufficient to support a conviction; physical evidence is not required." *State v. Jamie*, 8th Dist. Cuyahoga No. 102103, 2015-Ohio-3583, ¶ 39.

{¶22} Danner testified that he had met Collins before, and Collins was "chubby" and wore his hair in "dreads." On the evening in question, when the group was arguing, Collins "lift[ed] his shirt to show me the gun," and Collins said, "N * * *, you don't want these problems." Danner testified that the gun's handle "was sticking out so far I could see like where the bullet chamber at." According to Danner, he later saw Collins, whose nickname is "Man Man," use the same gun to shoot him: "he pointed the gun at me, it was a .40 caliber black and silver." Danner testified that the other man he saw was taller than Collins. "One was wearing a gray jogging outfit, the other was wearing some blue jeans and a black jacket and he had long dreads."

{¶23} Asked why he believed that the shooter was Collins, Danner testified as follows: "He had the same clothes on at [Lida's] house. * * * A gray jogging outfit." Danner testified that Collins was trying to "hide his face" by wrapping a shirt around it, but Danner recognized Collins's "hair, his eyes. All he had was — all of this was showing all that was not showing was his beard and mustache."

{¶24} According to Danner, Collins pointed the gun at him and said, "N * * *, I ain't going to fight you, n * * *." Danner started to run, and he was shot in the shoulder and then in the back. He did not see which of the men fired the first two shots. However, Danner saw Collins fire the third shot into his neck.

Q: What about the third shot?

A: Yes, I seen it.

Q: Where did that shot hit you?

A: The back of my throat.

Q: It hit you in the back of the throat?

A: Yeah.

Q: Meaning it entered from the back?

A: Yeah. He tried to shoot me in my head, but it missed.

Q: You saw him fire that shot?

A: Yes.

Q: Were you on the ground at this time?

A: Yes, I was looking at him on the ground.

Q: And this individual came up over you?

A: He stood over me, like, he was about to finish me off.

{¶25} Lida testified that she did not see Collins with a gun that night, but that Danner told her Collins had a gun. Lida also testified that Collins shot Danner, because she heard gunshots and then saw Collins run away from the scene. According to Lida, Collins was wearing the same gray jogging suit that he had been wearing earlier in the evening. Lida further testified that she did not tell the police that she saw Collins running from the scene that night because the officer "didn't ask me that." Asked if she thought that was relevant or important, Lida stated, "I don't know."

{¶26} Samantha testified that she did not see Collins with a gun on the night in question. Samantha also testified that Danner was the only person she saw with a gun that night. When asked to elaborate, she testified that Danner had a shotgun, although he "didn't actually pull it

out. It was just there, and he was trying to scare me and Samuel with it." After the argument in the apartment broke up, Samantha heard gunshots but did not see who fired the gun. According to Samantha, Collins left the apartment before shots were fired, and she did not see him again until the next morning. Samantha initially thought Collins went to a homeless shelter. Collins later told Samantha he had been at his friend Tiffany's house. Ultimately, Samantha testified that she did not know where Collins went that night; she only knew what Collins told her.

{¶27} Det. Garner testified that he responded to a call that a male had been shot in the area of E. 24th Street and Cedar Avenue. When he arrived, no one was at the scene, and he learned that the victim had been transported to the MetroHealth emergency room. Det. Garner went to Metro and spoke with Danner, who said that he got into an argument with his girlfriend's sister's boyfriend, whose nickname is "Man" or "Man Man." Det. Garner learned that Collins may have been at the homeless shelter on Lakeside, although the detective was unsure how he got this information. The description Det. Garner had of Collins was a "Black male, 5'8", dreads, stocky build, wearing a gray jogging suit." Det. Garner went to the shelter but could not locate Collins.

{¶28} Det. Garner next spoke with Danner on January 4, 2017. Danner identified Collins as the person who shot him. According to Det. Garner, Danner told him that Collins

> was inside the apartment and there was kind of beefing and arguing going back and forth. Like [Collins] kind of pulled up his shirt and [Danner] saw the butt of a gun sticking out. * * * Because [Danner] said that at the time he was shot that he kind of caught a glimpse of [Collins's] face, and then he recognized the same clothing that Collins was actually wearing earlier while he was inside the apartment.

**{¶29}** Det. Garner also testified that Tiffany's name did not come up during his investigation and her name did not appear anywhere in his report. According to Det. Garner, the first time he heard the name Tiffany was during Collins's trial.

**{¶30}** Tiffany Knight testified that she has known Collins for "like a year and a half," and they "have been intimate for over a year." According to Knight, on the night of December 26, 2016, at approximately 10:30 p.m., she picked Collins up from a store on East 36th Street, because "he just wanted to get away from Samantha and her family." When she picked Collins up, he was wearing "a white T-shirt, inside of his winter coat was like an orange and a green Army fatigue and blue jeans with like the sand stone wash." They arrived at Knight's house at 10:46 p.m. Knight's sister and her friend Tianna arrived at Knight's house "around 11:10" p.m. Knight's friends Kim and Kitty were already at Knight's house at the time. According to Knight, her sister and Tianna left at about 3:00 or 4:00 in the morning. Knight, her three children, Kim, Kitty, and Collins slept in the apartment, and Knight dropped Collins off at his mother's house at 7:00 the next morning. According to Knight, she attended a class that morning at Bryant and Stratton after she dropped off Collins.

**{¶31}** Knight testified that she remembered the details so specifically because she and Collins "were intimate that night, and I conceived a baby which I miscarried February 14th that year, the next year." Asked if she ever talked to the police regarding this case, Knight answered, "No."

**{¶32}** On cross-examination, Knight testified that she has known Collins for "almost two-and-a-half years." Asked more about the class she allegedly attended on the morning of December 27, 2017, after she dropped Collins off at his mother's house, Knight admitted that the school might have been on winter break at the time. She changed her testimony and stated that

she had to go fill out "some paperwork" at the school that morning. "I still call it class, because if I'm going to do something at school, it's class. * * * It was me going to fill out some paperwork with my teacher, so I consider it class."

{¶33} Knight further testified that she knew what Collins was wearing that night because she asked him what he was wearing before she picked him up at the store. Asked why, if she intimately knew Collins, she needed a description of his clothing, she testified that she does not like the area where Collins asked to be picked up. "I don't like going over there, because there's a lot of men that be out there and it was late. I don't go out of the house after dark."

{¶34} Knight testified that it was a four-minute drive from the store where she picked up Collins to her place. However, the state established that it took Knight and Collins 16 minutes to drive from the store to her house on the night in question. Asked to explain the discrepancy, Knight testified as follows: "Because I went in the store. I was hungry. I went in the store, got some chips, and I had talked to the guy that was in there. It was like the cashier guy. I asked him, Can I get some candy? And he took all day to give me the candy." The prosecutor asked Knight: "Why did you get out of the car in this area that you just told us you really don't like being in and you're not comfortable there?"
Knight responded: "Because I had to get some stuff * * * because I didn't want to go back out of the house * * * and that was the only store that was open at the time."

{¶35} Knight also testified that the first time she made "a real statement" that Collins was with her and her friends on the night that Danner was shot was during her testimony at Collins's trial.

{¶36} Upon review, we find that the weight of the evidence supports Collins's convictions, because the state's evidence was more persuasive than Collins's evidence. Danner

testified that Collins shot him. Multiple witnesses testified that Danner and Collins, along with others, were involved in an argument prior to the shooting. Multiple witnesses also testified that Collins was wearing a gray jogging outfit on the night of the shooting. Det. Garner testified that, from the beginning of his investigation, the suspect's description was a "Black male, 5'8", dreads, stocky build, wearing a gray jogging suit." This description fits Collins. It was not until Collins's trial that Knight stated that she was with Collins on the night of the shooting. Knight also testified that, at the time of the trial, she was still in a relationship with Collins. It is reasonable that the jury believed Danner's testimony over Knight's testimony.

{¶37} We cannot say that the factfinder lost its way in convicting Collins of shooting Danner, and Collins's third assigned error is overruled.

{¶38} Judgment affirmed.

It is ordered that appellee recover of appellant its costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

PATRICIA ANN BLACKMON, PRESIDING JUDGE

ANITA LASTER MAYS, J., and
LARRY A. JONES, SR., J., CONCUR